UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA **NIGHT BOX**
MIAMI DIVISION           **RECEIVED**

DEC 1 1 1997

CARLOS JUENKE
CLERK, USDC / SDFL / MIA

| | |
|---|---|
| SHIRIONIT HOSEM SECURITY MANUFACTURING (1991), LTD., an Israeli corporation | : |
| Plaintiff, | : |
| vs. | : Case No. 96-3476 *FAM* |
| SONNY KAHN, individually, SHLOMO EPSTEIN, individually | : |
| Defendants. | : |

FILED by _____ D.C.

DEC 1 7 1997

CARLOS JUENKE
CLERK U.S. DIST. CT.
S.D. OF FLA. - MIAMI

**AMENDED**
**COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff, Shirionit Hosem Security Manufacturing (1991), Ltd. ("Shirionit"),

brings this Complaint against Sonny Kahn ("Kahn") and Shlomo Epstein ("Epstein")

and alleges as follows:

1.      Plaintiff, Shirionit, is an Israeli company with offices in Tel Aviv, Israel.

2.      Defendant Kahn is a citizen of Miami, Florida.

3.      Defendant Epstein is a citizen of Miami, Florida.

4.      The jurisdiction of this Court is based on 28 U.S.C. § 1332(a) as the

parties are citizens of different states and the amount in controversy exceeds

seventy-five thousand dollars ($75,000.00).

5.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) and pursuant to the local rules of the United States District Court for the Southern District of Florida.

6.     All conditions necessary to the maintenance of this action have occurred, have been waived, or have been performed.

## GENERAL ALLEGATIONS

7.     In December 1994, Kahn approached representatives of Shirionit in Israel with a proposal that he would, if Shirionit expressed an interest in such a proposal, form a business entity to be the exclusive agent of Shirionit for the sale and distribution in the United States of locks manufactured by it.

8.     During the course of these initial meetings with Shirionit, Kahn represented repeatedly that he and his associate, Epstein, had the experience and the resources to form a business entity which would be capable of serving in the capacity of an exclusive distributor for Shirionit.

9.     After receiving an oral agreement from Shirionit that it would send representatives to the United States to negotiate a sales distribution contract, Kahn returned to Miami and on February 23, 1995, incorporated Crescent Lock International, Inc. ("Crescent Lock").

10.     In early March 1995, Shirionit sent representatives to Miami to negotiate and draft a sales distribution contract with the newly-formed entity,

2

Crescent Lock. The negotiating parties, all of whom spoke Hebrew fluently, negotiated a contract in Hebrew. During the course of the negotiations, Kahn and Epstein repeatedly represented to Shirionit's representatives that Crescent Lock would be well-capitalized, well-positioned and fully capable of acting as an exclusive distributor of Shirionit's locks.

11.    At one point in the negotiations, Kahn and Epstein presented to Shirionit's representatives a copy of Crescent Lock's Shareholder Agreement. As reflected in Shareholder Agreement, Kahn and Epstein represented that they were investing seven hundred thousand dollars ($700,000.00) into Crescent Lock and, also reflected in the Shareholder Agreement, were prepared to provide an additional contribution to be voted on by the board of directors of one million five hundred thousand dollars ($1,500,000.00) should it prove necessary for operations. A true and correct copy of the Shareholder Agreement is attached hereto as Exhibit "A".

12.    Also during the course of negotiations, Kahn and Epstein took Shirionit's representative to a facility owned by Jonathan Druchman, which Kahn and Epstein stated they would convert to a distribution center in the event Shirionit agreed that Crescent Lock would serve as an exclusive distributor for Shirionit.

13.    Kahn, as spokesman for himself and Epstein further promised that he would use his considerable media and marketing experience on behalf of Crescent Lock to successfully market and distribute Shirionit's locks.

3

14.     After several days of intensive negotiations, and based on the representations made by Kahn and Epstein, the parties executed a Memorandum of Agreement which was in Hebrew. A true and correct copy of the Memorandum of Agreement is attached hereto as Exhibit "B".

15.     The Memorandum of Agreement included all the material terms and obligations by and between the parties for Crescent Lock to serve as the exclusive distributor of Shirionit's locks in the United States.

16.     The Memorandum of Agreement provided that it would become effective upon approval of the board of directors of Shirionit. The Memorandum of Agreement further provided that after approval by Shirionit's board of directors, it would be a valid and binding determination of the parties' rights and obligations until such time that a more detailed agreement would be drafted. Once a detailed agreement was drafted and adopted as to form, it was to supersede the Memorandum of Agreement.

17.     Immediately after concluding the Hebrew version of the Memorandum of Agreement, Crescent Lock then suggested that the parties should begin translating their contract into English so as to have an English version available; however, because the parties had reached an agreement which was subject only to the condition that Shirionit's board of directors approve the contract, Shirionit suggested, and Crescent Lock accepted, the proposition that after approval by its

4

board of directors, Shirionit would have the contract translated and then offered for review to Crescent Lock.

18.     Accordingly, the parties signed a "Document" which references the Memorandum of Agreement reached by the parties and expresses their intent to also sign an English translation after approval by respective counsel.  This translation and subsequent approval of the translation by counsel for the parties was the only condition to the parties' agreement.  A true and correct copy of the Document is attached hereto as Exhibit "C".

19.     On March 23, 1995, Shirionit's board of directors approved the Memorandum of Agreement.  Immediately thereafter, Shirionit had the Memorandum of Agreement translated into English.  A true and correct copy of the English translation of the Memorandum of Agreement is attached hereto as Exhibit "D".

20.     On March 23, 1995, Shirionit sent a letter to Crescent Lock advising it that Shirionit's board of directors had approved the Memorandum of Agreement, and reminding Crescent Lock that the contract was now binding and effective.  In addition, Shirionit provided that it would begin drafting a more detailed contract as contemplated under the Memorandum of Agreement, and enclosed the English translation of the Memorandum of Agreement.

5

21.    On May 17, 1995, counsel for Crescent Lock, Abraham Galbult, purported to advise Shirionit that Crescent Lock had "decided not to proceed" under the contract based on alleged but unspecified additional terms to the contract.

22.    On June 6, 1995, Shirionit responded stating that no additional terms or proposals had been provided, and demanding that Crescent Lock abide by its obligations under the Memorandum of Agreement.

23.    During this period, and unbeknownst to Shirionit, Kahn and Epstein began negotiations with Shirionit's major Israeli competitor, Mul-T-Lock, Inc. ("Mul-T-Lock"). Kahn and Epstein, at a time when they had been provided with Shirionit's confidential pricing and sales information, thus attempted to negotiate a contract with Mul-T-Lock to allow them to serve as an exclusive distributor in the United States for Mul-T-Lock, under terms which were more favorable to them than those they had agreed upon with Shirionit.

24.    On June 6, 1995, the president of Mul-T-Lock forwarded a draft contract for Crescent Lock to serve as the distributor of locks in the United States to Kahn.

25.    In an apparent attempt to avoid the claims of Shirionit, Kahn and Epstein on July 10, 1995, incorporated Lock-It in order to serve in the capacity of exclusive distributor pursuant to the agreement Kahn and Epstein were negotiating with Mul-T-Lock.

26.    Kahn and Epstein who were the shareholders and officers of Crescent Lock also became the shareholders and officers of Lock-It. Kahn and Epstein had majority stock control of Crescent Lock and exercised complete dominion over the company's finances, policies and business practices.

27.    Upon information and belief, the assets and employees of Crescent Lock were at this time transferred to Lock-It. Additionally, Lock-It operated out of the identical physical location as Crescent Lock, and also used the identical phone line(s). Moreover, the balance in Crescent Lock's bank account was withdrawn and deposited into Lock-It's bank account.

28.    On or about July 14, 1995, Crescent Lock filed a complaint in state court (the "Crescent Lock Action") against Shirionit seeking a declaratory judgment that it did not have a contract with Shirionit. Crescent Lock did not, however, attempt to effectuate process on Shirionit.

29.    During this period, Kahn and Epstein continued to negotiate with Mul-T-Lock for an acceptable distribution contract. Several drafts of the contract were exchanged between these parties, originally between Mul-T-Lock and Crescent Lock and then later between Mul-T-Lock and Lock-It.

30.    While drafts of the contract were continuing to be exchanged between Mul-T-Lock and themselves, Kahn and Epstein began ordering shipments of locks and related supplies. Mul-T-Lock shipped the locks and related materials to Crescent Lock and Kahn and Epstein had Lock-It pay for the materials.

7

31.     On December 5, 1995, Shirionit removed the Crescent Lock Action to the Federal Court for the Southern District of Florida, and counterclaimed for breach of contract in a case styled Crescent Lock International v. Shirionit Hosem Security Manufacturing (1991) Ltd., 95-2724-CIV-Moreno.

32.     On or about January 11, 1996 Lock-It entered into a contract for the distribution of locks with Mul-T-Lock.

33.     On August 22, 1996 Crescent Lock filed a Suggestion of Bankrupcty. Subsequent to the bankruptcy filing and a motion filed by Crescent Lock, Judge Moreno entered an order dismissing the Crescent Lock Action and Shirionit's counterclaim on or about October 21, 1996.

**COUNT I**

**FRAUD IN THE INDUCEMENT AGAINST KAHN AND EPSTEIN**

34.     Shirionit reincorporates and realleges the allegations of paragraphs 1 through 33 of this Complaint as though fully set forth herein.

35.     During the course of the negotiations for the Memorandum of Agreement, Kahn and Epstein represented that they had the capacity, experience and resources to form a business entity to serve as an exclusive distributor for Shirionit including representations that (a) they would invest an initial $700,000 into Crescent Lock and would, upon demand and pursuant to the Shareholder Agreement, also invest up to an additional $1.5 million; and (b) they would utilize

8

Kahn's marketing experience and resources and Druchman's facility for Crescent Lock to serve as Shirionit's exclusive distributor.

36.     Such representations were untrue at the time they were made to Shirionit and were known to be untrue by Kahn and Epstein.

37.     Such representations were intended by Kahn and Epstein to induce Shirionit to enter into the Memorandum of Agreement with Crescent Lock.

38.     Shirionit justifiably relied on the representations and would not have agreed to enter into the Memorandum of Agreement but for said representations.

39.     Shirionit was damaged by the representations in that it was induced to enter into the Memorandum of Agreement and incurred significant expenses in preparation for performance under the Memorandum of Agreement.  Additionally, said representations caused Shirionit to reveal confidential pricing and sales information to its detriment.

## COUNT II

## NEGLIGENT MISREPRESENTATION AGAINST KAHN AND EPSTEIN

40.     Shirionit realleges and reincorporates the allegations of paragraphs 1 through 33 as though fully set forth herein.

41.     During the course of the negotiations for the Memorandum of Agreement, Kahn and Epstein represented that they had the capacity, experience and resources to form a business entity to serve as an exclusive distributor for Shirionit including representations that (a) they would invest an initial $700,000 into

9

Crescent Lock and would, upon demand and pursuant to the Shareholder Agreement, also invest up to an additional $1.5 million; and (b) they would utilize Kahn's marketing experience and resources and Druchman's facility for Crescent Lock to serve as Shirionit's exclusive distributor.

42.     Kahn and Epstein knew or should have known their representations were false.

43.     Kahn and Epstein intended Shirionit to rely on the representations.

44.     Justifiably relying on Kahn's and Epstein's representations, Shirionit invested and devoted significant resources to entering into and performing under a contract with Crescent Lock and also revealed confidential pricing and sales information to its detriment.

45.     Kahn and Epstein had a duty to insure that they were going to make representations that were truthful.

46.     Kahn and Epstein breach of that duty was the proximate cause of Shirionit's damages.

### COUNT III

### PIERCE THE CORPORATE
### VEIL AGAINST KAHN AND EPSTEIN

47.     Shirionit realleges and reincorporates the allegations of paragraphs 1 through 33 as though fully set forth herein.

48.   Kahn and Epstein exercised complete domination over Crescent Lock and ignored corporate formalities so that Crescent Lock had no separate mind, will or existence of its own.

49.   Kahn and Epstein used this control to commit wrongdoing in improperly inducing Shirionit to reveal confidential information, including pricing and marketing information, and then using it to contract with Mul-T-Lock. Said conduct is unjust and in contravention of Shirionit's legal rights.

50.   The control and breach of duty by Kahn and Epstein was the proximate cause of Shirionit's damages.

51.   Crescent Lock is the alter ego of Kahn and Epstein.

52.   Kahn and Epstein through their alter ego, Crescent Lock, did not perform its obligation under the contract it entered with Shirionit.

53.   Kahn and Epstein, through their alter ego, Crescent Lock, breached their contract with Shirionit.

54.   Shirionit has been damaged by Kahn's and Epstein's, through their alter ego, Crescent Lock, breach of contract.

WHEREFORE, Shirionit demands judgment against Kahn and Epstein for (a) all damages relating to the negotiation of and entry into the Memorandum of

11

Understanding; (b) for damages caused by the breach of contract, including pre and post judgment interest; (c) for the costs of this action; and (d) for such other and further relief as this Court deems appropriate.

Stanley H. Eleff
Florida Bar No. 0269018
John E. Johnson
Florida Bar No. 0593000
Charles M. Harris, Jr.
Florida Bar No.967459
**TRENAM, KEMKER, SCHARF, BARKIN,
FRYE, O'NEILL & MULLIS, P.A.**
Tampa, Florida  33601-1102
101 East Kennedy Blvd., Ste. 2700
Ph: (813) 223-7474
FAX: (813) 229-6553
Attorneys for Plaintiff, Shirionit Hosem
Security Manufacturing (1991), Ltd.

Dated: _____Dec /1_____, 1997.

12

EXHIBIT A

<u>SHAREHOLDER'S AGREEMENT</u>

THIS AGREEMENT entered into this _____ day of _____, 1995, by and between SONNY KAHN, RUSSELL W. GALBUT, SHLOMO EPSTEIN and JONATHAN DRUCKMANN, (hereinafter individually sometimes referred to as "Shareholder" or collectively as "Shareholders") and <u>CRESCENT LOCK INTERNATIONAL, INC.,</u> a Florida Corporation (hereinafter referred to as the "Corporation").

W I T N E S S E T H:

WHEREAS, the corporation has been formed for the specific purpose to develop, manufacture, market and sell locks and locking mechanisms and such other devices and associated items that the Board of Directors may determine to be appropriate from time to time in the United States and elsewhere; and

WHEREAS, the Shareholders own all issued and outstanding shares of stock in the Corporation (hereinafter referred to as "Shares" or "Stock"); and

WHEREAS, the parties hereto agree that it is in their mutual best interests to provide that the Stock owned by the Shareholders be subject to restrictions on the transfer thereof in order to provide for the harmonious disposition of Stock, the continuity of management and ownership of the Corporation and to provide for the marketability of such Stock, the management and operation of the

1

business undertaken by the corporation, to insure the purpose of the corporation is carried out and to provide for the discharge of obligation of the corporation to the Shareholders; and

WHEREAS, there is currently authorized 10,000 shares of the capital stock of the Corporation with 4,000 shares of said stock having been issued to the following individuals ("Current Shareholders) in the following quantities:

| Name | Number of Shares | Percentage Ownership |
|------|------------------|----------------------|
| 1.  Sonny Kahn | 1,000 | 25% |
| 2.  Russell W. Galbut | 1,000 | 25% |
| 3.  Shlomo Epstein | 1,000 | 25% |
| and | | |
| 4   Jonathan Druckmann | 1,000 | 25% |

WHEREAS, it is the intent of the Shareholders that their interest and relationship in the Corporation be evidenced by this agreement.

NOW THEREFORE, it is agreed by the Shareholders as follows.

ARTICLE I

SALE, ASSIGNMENT OR TRANSFER OF STOCK

1.1  Sale, assignment or Transfer.  So long as this Agreement shall remain in full force and effect, no Shareholder shall sell,

2

assign, transfer, devise, pledge, encumber, hypothecate or otherwise dispose of any of the shares of Stock of the Corporation, now or hereafter owned or held, (hereinafter referred to as a "Transfer of Stock"), unless made in accordance with the provisions of this Agreement. No Transfer of Stock, other than pursuant to the provisions of this Agreement, shall be valid or binding upon the Corporation or any Shareholder.

1.2  Right of First Refusal.

(a)  Other than initial sales to Bruce Menin, Mordi Bitton, _____, and _____, any Shareholder (the "Selling Shareholder") who has received a bona fide offer from a third party prospective purchaser ("Qualified Purchaser") to purchase all or any portion of the Selling Shareholder's Stock, before selling any of his Stock, shall first offer the sale thereof to the Corporation upon the same terms and conditions stated in such bona fide offer.

(b)  The Board of Directors of the Corporation, without the participation of the Selling Shareholder, shall determine whether the Corporation will accept the Selling Shareholder's offer to it described above. In the event that the Corporation shall not accept said offer by written notice forwarded no later than thirty (30) days following receipt of such offer, then the Selling

3

Shareholder shall offer such Stock to the other Shareholders (the
"Remaining Shareholders") upon the same terms and conditions
stipulated in the offer.

   The Remaining Shareholders shall have the right to
purchase all, but not part, of the offered Stock in such portions
as they shall agree upon; but if they fail to agree, then each of
them shall be entitled to purchase a fraction thereof, the
numerator of which is the total number of shares of Stock owned by
the Remaining Shareholder and the denominator of which is the total
number of shares of Stock owned by all of the Remaining
Shareholders. If the Remaining Shareholders do not exercise their
rights by written notice forwarded no later than thirty (30) days
after receipt of such offer, then the Selling Shareholder may sell
all of his remaining Stock to the Qualified Purchaser, under the
same terms and conditions as are set forth in the original bona
fide offer. The sale to the Qualified Purchaser must be
consummated within forty-five (45) days from the last date on which
the Remaining Shareholders had the right to accept the offer to
purchase. Evidence that the sale has been so consummated shall be
supplied in writing by the Selling Shareholder and the Qualified
Purchaser to the Corporation and the Remaining Shareholders. If
the sale has not been consummated within said forty-five (45) day

4

Shareholder subject to no pledge, lien or encumbrance, (B) appropriate blank stock powers, properly executed together with any requisite state transfer stamps affixed thereto, and ⁰ any and all other documents that may be reasonably required by the purchaser thereof and (ii) the Corporation or the Remaining Shareholders, as the case may be, shall pay the agreed-upon consideration.

1.3  The Current Shareholder shall have the right to assign in whole or in part his shares of the corporation to a family member. The family member shall be defined as to include spouse, lineal descendants, parents, siblings or spouse's of such family member, or any fiduciary holding shares on behalf of a family member to facilitate estate planning on behalf of any Shareholder. In the event that a current Shareholder shall only make a partial transfer of his or her shares pursuant to the terms of this paragraph, the current Shareholder shall retain an irrevocable proxy to vote such shares so transferred and shall continue to be a member of the Board of Directors as provided herein.

## ARTICLE II

### ELECTION OF DIRECTORS: OFFICERS

2.1  **Directors.**  The Board of Directors shall consist of five (5) natural persons.  The Shareholders agree to vote a sufficient

6

number of their Shares so as to cause SONNY KAHN, RUSSELL W. GALBUT, SHLOMO EPSTEIN and JONATHAN DRUCKMANN and BRUCE MENIN, to be elected as directors of the Corporation, so long as they remain Shareholders of the Corporation.  In the event all, but not less than all the shares of any Current Shareholder to this Agreement is sold or transferred pursuant to the provisions herein, the purchaser/transferee of such shares shall be entitled to be appointed and/or elected to the Board of Directors in lieu of the selling Shareholder.  If any current Shareholder makes a partial transfer of his or her shares pursuant to Paragraph 1.3, such transferor (Shareholder making the transfer) shall remain a member of the Board of Directors and the transferee shall not be a member of the Board of Directors.

    2.2  **Officers.**   The following persons shall hold the following executive offices until their successors are duly elected and qualified:

| | |
|---|---|
| President | Sonny Kahn |
| Vice-President | Jonathan Druckmann |
| Secretary | Russell W. Galbut |
| Treasurer | Shlomo Epstein |

7

18 OCT '95  22:34   KAHT  3ROS.                                    P.T.21

## ARTICLE III

## MANAGEMENT OF THE CORPORATION; VOTING; PROXIES

3.1  Corporate Purpose.  The parties acknowledge and agree
that the purpose of the Corporation is to act, by and through the
Corporation, to develop, manufacture, market and sell locks and
locking mechanisms and such other devices and associated items that
the Board of Directors may determine to be appropriate from time to
time in the United States and elsewhere and to engage in other such
lawful business as determined by the Board of Directors from time
to time and that each Shareholder agrees to use its best efforts to
further such corporate purpose.

3.2  Shareholders Vote for Directors.  The Shareholders agree
that the By-Laws of the Corporation shall at all times provide for
a minimum of five (5) directors and that four (4) directors shall
constitute a quorum at each Board Meeting. No Shareholder shall,
without the prior written consent of all the Shareholders:

A.    Use any money belonging to the Company or pledge its
credit except in the ordinary course of business and on the account
and for the benefit of the Company.

B.    Release or discharge any debt or obligation due the
company without receiving the full amount thereof.

a

C.    Permit or cause to be permitted any act whereby the property of the Company may be subject to attachment, garnishment, seizure or forfeiture.

D.    Cause the Company to become a guarantor, surety, endorser or give any note to any person or entity.

E.    Recapitalize, merge, liquidate, sell, substantially all of the assets or issue additional stock of the Company.

3.3   **Vacancies.**    Whenever any vacancy in the Board of Directors (whether occurring by reason of death, resignation, removal or otherwise) is to be filled at any Shareholders meeting, the Shareholder (or his successor) who is designated the director whose departure resulted in such vacancy, will designate a successor to fill such vacancy, and at such meeting each Shareholder will cause all of the Shares of Common Stock owned by such Shareholder to be voted for the election of such designee.

3.4   **Quorum and Voting.** Each Shareholder agrees that the By-Laws of the Corporation shall require (I) a quorum for all meetings of the Board of Directors of the Corporation shall consist of a minimum of four members of the Board of directors, and (ii) mailing of necessary statutory notice, and (iii) all actions taken by the Board shall require a majority or super vote as the case may be. Each Director shall be entitled to one (1) vote.

9

vote, if a unanimous consent in writing setting forth the action so taken shall be signed by all of the shareholders (or their proxies).

3.7 <u>Issuance of Stock.</u> So long as this Agreement shall remain in full force and effect, the Corporation shall not authorize the creation, issue or reissue of any shares of stock without receiving the unanimous consent of all the Shareholders except as provided hereinabove.

3.8 <u>Management.</u> The Shareholders agree that the management of the day to day activities of the corporation shall be managed and controlled by the president of the corporation. The President shall enact the policies and procedures directed by the Board of Directors.

ARTICLE IV

TERMINATION

4.1 <u>Termination of Agreement.</u> This Agreement shall terminate on the occurrence of any of the following events:

(a)   the Corporation's ceasing to conduct any business;

(b)   the making of a general assignment by the Corporation for the benefit of its creditors;

(c)   the appointment of a trustee or receiver for the corporation, or for its property or any substantial portion

11

thereof;

(d) the filing by the Corporation of any voluntary petition, or the filing against the Corporation of any involuntary petition, under any federal or state insolvency or bankruptcy law;

(e) the adjudication by any court of competent jurisdiction that the corporation is insolvent or bankrupt;

(f) the liquidation or dissolution of the Corporation; or

(g) the agreement to terminate this Agreement by all of the Shareholders who are subject thereto at the time of such agreement.

4.2 <u>Termination as to a Shareholder.</u> This Agreement shall terminate as to any Shareholder in the event that all the Stock of such Shareholder is purchased pursuant to Article I hereof.

ARTICLE V

<u>NOTICES</u>

All notices hereunder shall be in writing and shall be deemed to have been duly given, unless otherwise provided herein, if given by actual personal delivery or by mailing by registered or certified mail, postage prepaid, to each of the appropriate parties, as follows:

12

Parties:                          Sonny Kahn
                                  555 N.E. 15th Street
                                  Miami, Florida 33125


                                  Russell W. Galbut
                                  555 N.E. 15th Street
                                  Miami, Florida 33125

                                  Bruce A. Menin
                                  555 N.E. 15th Street
                                  Miami, Florida 33125

                                  Shlomo Epstein
                                  3267 N.E. 168th Street
                                  No. Miami Beach, Florida 33160

                                  Jonathan Druckmann
                                  18151 N.E. 31st Court
                                  Apartment 1101
                                  No. Miami Beach, Florida 33160

With a copy to:                   Abraham A. Galbut, Esquire
                                  999 Washington Avenue
                                  Miami Beach, Florida 33139

                                          and

                                  Steven B. Dolchin, Esquire
                                  The Oaks, Suite 202 B
                                  4330 Sheridan Street
                                  Hollywood, Florida 33021

or to such other address as any party may designate by notice given

hereunder.


                              ARTICLE VI

                   ENDORSEMENT ON STOCK CERTIFICATES

    The certificate(s) representing all Shares of Capital Stock


                                  13

issued by the Corporation to all Shareholders shall have endorsed upon the face or reverse thereof the following legends:

> "The shares evidenced by this certificate have not been registered under the Securities Act of 1933, as amended, and may not be sold or transferred unless registration or qualification under such Act is not required in connection with such proposed sale or transfer."

> "The sale, assignment, transfer, pledge, encumbrance, or other disposition of the shares evidenced by this certificate is subject to all of the terms, restrictions and conditions of an Agreement dated as of _____, between the Corporation, and the shareholders of the Corporation, a copy of which is on file and open to inspection at the offices of the Corporation."

## ARTICLE VII

### INITIAL INVESTMENT AND BUDGET

7.1  <u>Initial Investment</u>. The Shareholders agree to initially invest and/or provide loans on percentage of stock ownership basis, for the aggregate sum of $700,000.00.

7.2  <u>Additional Investment.</u>  The Board of Directors may, by a majority vote, require all the Shareholders to make an additional capital contribution or loan to the corporation in proportion to their stock holdings, provided the additional capital need of the corporation, in the aggregate, is less than $1.5 million during a 12 consecutive month period.  Should the additional capital need of

14

the corporation be $1.5 million or more, a super vote, as provided in paragraph 3.5, is required.

7.3 **Budget.** The Shareholders agree that it will be the responsibility of the Board of Directors to prepare an annual budget for the operation of the corporation. The budget shall be for a calendar year and shall be prepared and adopted prior to the end of the first quarter of each year. If in the event the Directors are unable to agree upon any annual budget the budget adopted for the prior year adjusted for C.P.I. variances shall be controlling until a new budget is adopted by the Board of Directors. The Shareholders agree that such budget shall provide the appropriate item or items for the marketing of such products as described herein by Crescent Heights Marketing, Inc.

ARTICLE VIII

MARKETING AND PRODUCTION

8.1 **Marketing.** The Shareholders agree SONNY KAHN to make the marketing decisions for the marketing and selling of the products to the corporation. The costs and expenses associated with the marketing shall be consistent with the budget as prepared pursuant to the terms hereinabove. SONNY KAHN shall be authorized to use whatever facilities or other corporations, including corporations in which he and/or other Shareholders have an interest therein in

15

order to effect such marketing.  It is understood and agreed that any facility or corporation that or any Shareholder may have an interest in provide marketing and advertising services to the corporation at their cost and not make a profit, commission or be compensated for the marketing efforts.

8.2    _Production_ The Shareholders agree that SHLOMO EPSTEIN and JONATHAN DRUCKMANN to be responsible for and supervise all the decisions regarding the manufacturing and production of products to be produced, marketed and sold by the corporation.  The costs and expenses associated with the manufacturing and production shall be consistent with the budget as prepared pursuant to the terms hereinabove SHLOMO EPSTEIN and JONATHAN DRUCKMANN shall be authorized to use whatever facilities or other corporation including corporations in which they or other Shareholders have an interest therein in order to effect such manufacturing and production. It is understood and agreed that any facility or corporation that any Shareholder may have an interest in provide the manufacturing and production to the corporation at their cost and not make a profit, commission or be compensated for the manufacturing and production efforts.

8.3    The Board of Directors may consider entering into an employment agreement with SHLOMO EPSTEIN and JONATHAN DRUCKMANN

16

regarding the manufacture and production of the products for the Company on or about the fourth month following execution of this agreement.

## ARTICLE IX

### MISCELLANEOUS

9.1 <u>Entire Agreement: Amendment</u>.  This instrument contains the entire agreement of the parties pertaining to the subject matter hereof.  No amendment or modification of this Agreement shall be valid or binding unless made in writing and signed by all parties hereto.  This instrument by its terms, does hereby revoke any and all prior understandings of the parties, whether oral or written, relating to the subject matter hereof.

9.2 <u>Counterparts</u>.  This Agreement may be executed in counterparts, each of which shall be deemed an original, and all of which shall constitute one and the same instrument.

9.3 <u>Benefits: Binding Effects</u>.  This Agreement shall inure to the benefit of and be binding upon the parties hereto, their respective heirs, personal representatives, successors and assigns.

9.4 <u>Breach: Injunctive Relief</u>.  Each party hereto agrees that a breach of this Agreement may result in irreparable injury to the other parties hereto, and therefore, in addition to all other remedies provided by law, the parties hereto agree that the parties

17

injured by a breach shall be entitled to (a) an injunction to prevent a breach or contemplated breach of this Agreement, (b) specific performance of the provisions of this Agreement, or other appropriate equitable relief.

9.5   **Severability of Provisions.**  The invalidity of any words, phrases, sentences, clauses, or sections contained in this Agreement shall not effect the enforceability of the remaining portions of this Agreement, all of which are inserted conditionally on their being valid at law, and, in the event that any one or more of the words, phrases, sentences, clauses or sections contained in this agreement shall be declared invalid, this Agreement shall be construed as if such invalid words, phrases, sentences, clauses or sections had not been inserted.

9.6   **Applicable Law.**  This Agreement shall be construed, and the legal relations between the parties shall be determined in accordance with the laws of the State of Florida, except with respect to corporate law applicable to the jurisdiction within which the corporation was originally incorporated.

9.7   **Litigation.**  In the event of any litigation arising out of or related to this Agreement, venue shall be in Dade County, Florida. In connection with any such litigation, the prevailing party shall be entitled to recover all costs incurred, including

18

, reasonable attorneys' fees at trial and appellate proceedings.

9.8  <u>Further Assurances.</u>  The Corporation and/or Remaining Shareholders shall have the right to require and any shareholder selling his Stock agrees to execute such documents as shall be appropriate in the context, including, without in any way limiting the generality of the foregoing; minutes of corporate meetings, waivers of notice and consents thereto; resignations from any fiduciary capacity held with respect to any pension, profit sharing or other deferred compensation or employee benefit plan of the Corporation; certified copies of corporate resolutions; amendments to the Articles of Incorporation; affidavits and bills of sale.

9.9  <u>Deadlock.</u> In the event that the Shareholders are equally split on any issue (a "Deadlock"), the sole remedy shall be submission of the issue to arbitration as provided for in Section 9.9(I).

(I)  In the event of a Deadlock, any Shareholder may elect to submit the dispute to arbitration pursuant to the rules and regulations of the American Arbitration Association in Miami, Dade County, Florida.  One arbitrator shall be selected by each Shareholder or group of Shareholders proposing and opposing the resolution(s) resulting in the deadlock.  The Arbitrators so selected shall then select a number of Arbitrators where the total

19

Arbitrators shall be an odd number. As an example, if there are three groups of Shareholders proposing and opposing a resolution, each group of Shareholders shall be entitled to select one (1) Arbitrator, the three Arbitrators so selected shall then select two Arbitrators, the five Arbitrators shall then arbitrate and decide the issues in reference to the disputed resolution. No Shareholder may serve as an arbitrator. The panel so selected shall decide any issue by majority vote.   The decision of the arbitration panel shall be conclusive and binding and may be enforced by a court of competent jurisdiction.

    9.10    <u>Competing Investments.</u>  Each Shareholder shall be entitled at all times to maintain and own other investments and businesses.   Each Shareholder acknowledges that each Shareholder may actively pursue other businesses and be involved in other corporations.   Notwithstanding the above each Shareholder agrees not to actively compete directly or indirectly with the corporation in pursuing its corporate purpose of manufacturing, producing, marketing and selling super locks and doors.  It being specifically understood that there is no obligation of any Shareholder to purchase products of the corporation for or on behalf of any Shareholder or other corporation or business entity in which any Shareholder is involved.

9.11 **Name.** The Shareholders acknowledge that the name and symbols associated with Crescent and/or Crescent Heights is a proprietary interest owned by Sonny Kahn and/or Russell W. Galbut. Sonny Kahn and/or Russell W. Galbut hereby agree that the name Crescent and any symbol used and developed in the manufacturing of the lock, doors or other items produced by the corporation shall continue to be used and remain forever with the corporation or its successors and assigns. Notwithstanding the foregoing, no Shareholder, except Sonny Kahn and/or Russell W. Galbut, may use any symbol, name or corporate or trade name, or otherwise conduct business under the name or symbol, which is similar to, or may be confused with, the word "Crescent" or the corporate symbol currently used by Crescent Height Marketing, Inc., or any other corporation associated therewith.

9.12 **Signatures on Checks.** All funds in reference to the corporation shall be placed in accounts to be designated from time to time by the Board of Directors, shall be deposited solely in corporate accounts which shall require the signature of at least two (2) designees acquiring at least one signature from SHLOMO EPSTEIN or JONATHAN DRUCKMANN to be determined by the Board of Directors. Notwithstanding the foregoing the corporation may establish a petty cash account not to exceed the check writing

21

authority of greater than $5,000.00 that may only require one (1)
signature.

  9.13  <u>Review of Documents and Corporate Records.</u>  All parties
shall each have a right to review all documents, agreements,
contracts, statements and/or other materials used in connection
with the Property and/or the activities of the Corporation.  All
books and records shall be kept at the corporate office.

  9.14  <u>S Corporation Election</u>

   A.  The Shareholders acknowledge that the Company has
elected to be treated as a Small Business Corporation (the "s
corporation") under Sec. 1362 of the Internal Revenue Code of 1986,
as amended (the "Code").  The Shareholders hereby agree that they
will not commit or allow to be committed any act or event which may
result in the termination of the Company's status as an s
corporation unless all the Shareholders unanimously agree in
writing.  In the event the Company's status as an s corporation is
terminated, the Shareholders agree to consent to elect to close the
taxable year and allocate the income and loss items of the Company
as of the termination date.  Should the Company's status as an s
corporation not be terminated, but a Shareholder terminates his
interest in the Company, all the Shareholders agree to consent to
close the taxable year and allocate the income and loss items, if

22

_____

_____


RUSSELL W. GALBUT, Individually


_____

_____


SHLOMO EPSTEIN, Individually


_____

_____


JONATHAN DRUCKMANN, Individually

Case 1:96-cv-03476-FAM   Document 52   Entered on FLSD Docket 12/19/1997   Page 35 of 50

EXHIBIT B

ג' ו

## זכרון דברים

שנחתם ביום 13 במרץ, 1995.

בין :
שירויונית חסם מוצרי ייצור מוצרי בטחון (1991) בע"מ

לבין :
CRECENT LOCK INTERNATIONAL, INC.

נחלן תמצית הסכמת הצדדים

### הגדרות

הטריטוריה : ארה"ב, קנדה ומקסיקו.

המוצרים : כל המוצרים בפיתוח ו/או ייצור שירויונית כיום ובעתיד כולל חלקים שלהם וכולל מוצרים משלימים ונלווים.

החברה האמריקאית : CRECENT LOCK INTERNATIONAL, INC. ו/או כל צורת ניהול עסקים במישרין ו/או בעקיפין של CRECENT LOCK INTERNATIONAL, INC. ו/או של בעלי מניותיה בעת הקמתה ובעתיד לענין שיווק ייצוג, הפצה, קידום מכירות של  המוצרים.

שירויונית : שירויונית חסם יצור מוצרי בטחון (1991) בע"מ ו/או חברה בשליטתה ו/או בעלי מניותיה.

### תנאים לזכות הפצה בלעדית

בכפוף לקיום מלא ומדויק של התנאים המפורטים בהסכם זה ושל חתנאים המפורטים לחלן, מקנה שירויונית לחברה האמריקאית את זכות החפצה הבלעדית של המוצרים בטריטוריה.

א. כל המוצרים שבהם תעסוק החברה האמריקאית יהיו בשם הסימן המסחרי של שירויונית, בין אם הוא רשום ובין אם לאו (נחל "השם המסחרי").

ב. אי תחרות : חחברה האמריקאית ו/או בעלי מניותיה ימנעו, במישרין או בעקיפין, בעצמם ו/או באמצעות אחרים מלעסוק בכל אופן שהוא בפעולות שיווק, קידום, פרסום ומתחרים בטריטוריה בטריטוריה.

ג. החברה האמריקאית  תמנע מכל צורה של מעורבות, במישרין או בעקיפין, במכירה, שיווק, קידום מכירות או העברה של המוצרים אל מחוץ לטריטוריה.

ד. מכירות המוצרים בטריטוריה יהיו במחיר שלא יפחת ממחיר המכירה לחברה האמריקאית ואם לא נמכר המוצר לחברה האמריקאית במחיר שלא יפחת ממחיר חמחירון חבינ"ל של שירויונית. יחד עם זאת אם ימכרו מוצרים נתחרים בטריטוריה על ידי אחרים והחברה תחליט ביחד עם שירויונית על הפחתת מחירים זמנית ועקב כך ינועו מוצרים אל מחוץ לטריטוריה במחירים תנמוכים ממחירי המכירה חבינ"ל של שירויונית, תשפה תחברה את שירויונית בגין כל הוצאה ו/או פיצוי וכד' שבחם יוקב תביעת צד ג'.

ה' צ'

## תקופת ביניים

זמן: ממועד אישור זכרון דברים זה ו/או חתימת הסכם מפורט כמוקדם ועד תום שנתיים.

תנאים: השקעה בקידום המוצרים 300,000$ כמינימום מתוך כך בפרסום 500,000$ מינימום.

רכישת 50,000 מנועלים משירוניות.

החברה האמריקאית תמנע מכל עיסוק בפעילות ייצור, במישרין או בעקיפין, בעצמה ו/או באמצעות אחרים.

אי עמידה בתנאים מקנה לשירוניות הזכות לבטל הסכם זה מבלי לקבל תגמול כלשהו ובעיקר בינון פיתוח שוק בטריטוריה.

## תקופת עיקרית

זמן: 20 שנה + אופציה ל 20 שנה נוספות

תנאים: השקעה נוספת בפרסום של מינימום 1.5 מליון $

רכישת 50,000 מנועלים נוספים בתקופה של 3 שנים עוקבות שלאחר תקופת הביניים ובסה״כ מצטבר של 200,000 מנועלים בתקופה של עד 5 שנים ממועד אישור זכרון דברים זה.

אי עמידה בתאים מקנה לשירוניות זכות לבטל הסכם זה.

## ייצור

תנאי לכניסה של החברה האמריקאית לייצור במישרין ו/או בעקיפין ו/או לרכישת מנועלים מקבלני משנה (להלן ״כניסה לייצור״) : רכישת 50,000 מנועלים משירוניות בתקופת הביניים.

## שיתוף בפעילות

שירוניות רוכשת 1/3 בחברה האמריקאית בתמורה כמפורט להלן :

השקעותיה של שירוניות בחברה האמריקאית בתקופת הביניים בה ישקיעו כל בעלי המניות בחברה האמריקאית בהתאם להתחייבותיהם, תתבצע מתוך תמורות חמיניות לה בגין מכירת המנועלים לחברה האמריקאית. כצורך כך, תשקיע שירוניות את מחציה הכנסותיה ממכירת 10,000 המנועלים הראשונים לחברה האמריקאית עד למצב בו תשקעותיה בחברה האמריקאית יסתכמו לסך של 250,000$. חצדדים מסכימים כי בתקופת הביניים אם תדרש שירוניות להשקעה נוספת בחברה האמריקאית מעבר לסך של 250,000$.

עם תום תקופת הביניים וחכניסה לייצור : תשקיע שירוניות בחברה האמריקאית משאבים בערך של הסכום מתאחדיב מאחוקתיה ביחס להשקעות כלל בעלי מניות בחון וגפרג של החברה האמריקאית. חצדדים מסכימים כי לשירוניות האפשרות לבצע את השקעה בחון בתקופת הביניים או בדרך של קיזוז הכנסותיה ממכירת מנועלים לחברה כפי שתעשה בתקופת הביניים.

הסכם בין בעלי חמניות של החברה האמריקאית ומסמכי הייסוד של החברה האמריקאית יתוקני באפן שיאפשר לשירוניות מעמד של בעל זכויות שווה כנתחייב משיעור אחזקותיה.

## התחייבות לשיווק

החברה האמריקאית מתחייבת לעשות כל שביכולתה כדי לקדם, לשווק ולמכור את כל המוצרים כולל פיתוחים חדשים. המאמצים יכללו : אחזקת מלוי מחאים חן של מוצרים והן של חלפים, דוגמאות, פרסומת במדיות שונות וכן התחייבות להקמת מערך שיווק ומרכז הפצה.

## זכויות קניו רוחני

החברה האמריקאית מכירה הכרה מלאה בזכויות קניו רוחני מכל סוג שהוא, אפילו טרם נרשמו, של שירעוניות ביחס למוצרים.

כן מכירה החברה האמריקאית בכל שבעילות בכל זכויות הקניו הרוחני נותרות בבעלותה של שירעוניות הן בתקופת ההסכם והן לאחריה.

## תמלוגים

החברה האמריקאית מתחייבת ומצהירה כדלקמן:

הבעלות במוניטין ובכל זכויות הקניו הרוחני הנוגעי נותרות של שירעוניות.

בכל מקרה שירעוניות לא תחזיק ב-1/3 הזכויות בחברה האמריקאית ישולמו כה תמלוגים בשיעור 1$ לכל מוצר ו/או חלק ממנו תנמכר בנפרד בטריטוריה.

התמלוגים המשתלמים על פי הסכם זה נקויים מכל מס.

## הזמנות

תתחייבות החברה האמריקאית לרכוש משירעוניות מנעולים והתחיבות שירעוניות לספק המנעולים יחתו על פי התנאים כמפורט להלו:

החזמנות ייפרסו באופו שוה ככל האפשר על פני התקופה

כל חזמנה תהיה בכמות מנימלית של 1,000 מנעולים ובכמות מקסימליון של 5,000 מנעולים בחודש.

מחיר המכירה למנעול, כלא צילינדר, הינו 55$ (אפשרות קיווו כיסויים, מגן צילנדר וידיאת 58.

המחיר הינו FOB ישראל.

אם החזמנה ייפתח מכתב אשראי בלתי חוזר מבנק סוג א'

האספקה בתו90$ יום מפתיחת מכתב אשראי

מחירי המכירה הנשתלמים על פי הסכם זה נקויים מכל מס.

אם יוזמנו דלתות בטחוו יחולו התנאים שלעיל בשיניים הבאים:

הזומה חודשית מקסימלית עד 1,000 דלתות בחודש

מחיר מכירה 245$ לדלת סופר לוק 2000. רצ"ב נחירון בינ"ל של שירעוניות.

## פרסום

החברה האמריקאית מתחיבת כי לפני התחלת חפירסום תמציא לשירעוניות תוכנית פרסומת כולל הערכות לוח זמים וכו העתקי חמרור הפירסומי.

הצדדים יכולים לעשות שימוש בחומר חפירסומי האחד של השני, כלא תשלום.

## המחאת זכויות

הצדדים אינם רשאים לחמחות אוו זכויות על פי הסכם זה ל\ה חור אלא בהסכמה בכתב של הצד השני. האמור לא יחול על חנפקה מניות לציבור.

## אחריות

הצדדים מסכמים בואת כדלקמן:

אחריות שירעוניות הינה לתקינות מיסכמות של המוצרים בלבד  במקרה של אי התאמה אפשרות לשירעוניות לזקנת את חברה האמריקאית כחחליף המוצר או לתקנו.

אחריות שירעוניות חינה בכל מקרה רק כלפי חברה האמריקאית ולא כלפי אף אחד אחר.

לחברה האמריקאית למעו הסר ספק אין לשירעוניות אחריות ולא תהיה כה אחריות כלפי צד ג' או כלפי לענינ נזקים, אבדו חכנסות ו/או רווחים בין במישרין ובין בעקיפין.

בכל מקרה בו יתוכל על שירעוניות אחריות, ועל פי הדראות כל דין, תשפח החברה האמריקאית את שירעוניות על פי דרישתה הראשונה בכל סכום שייפסק נגדה או הוצאה שתשא בה בגיו חאמור.

האמור לעיל יחול גם לאחר תום תקופת ההסכם.

החברה האמריקאית מתחייבת לבטח עצמה בפוליסת ביטוח אחריות מוצר בסכום שלדעתה חינו

מספיק ולכלול בפוליסה גם את שירוונית כמוטב.

## תוצאות סיום

מבלי לגרוע מהוראות כל דין, יכוליט חצדדים לסיים הסכם זה בכל אחד מן המקרים הבאים
פשיטט רגל, פירוק, מינוי כונס נכסים וכיוצא בזה

בכל מקרה של סיום ההסכם עקב הפרה של אחד הצדדים, מתחייב הצד המפר, ומתחייבים כל
בעלי מניותיו כי במשך 3 שנים מתום החסכם הם ימנעו, יחד ולחוד מלעסוק, במישרין ובעקיפין,
בייצור ו/או בהפצה ו/או מכירה ו/או במתן שירות, במוצרים ראו בחלקים שלהם ו/או בקשר
אליהם ו/או מתחרים ו/או דומים ו/או משלימים בטריטוריה.

אם הפרח החברה האמריקאית את החסכם לא תחא החברה האמרנקאית זכאית לעשות שימוש
בזכויות הקניין הריחני ולא תהיה רשאית לחציג עצמה כבעלת וכויות הפצה ו/או אחרות הקשורות
בכך.

## סודיות

הצדדים מתחייבים לשמור בסודיות זכרון דברים זה, החסכם שייחתם ביניהם וכל מידע כללי
ובחיב זכויות הקנייניות של שירוונית ודו"חות שיועברו ביניהם. האמור יחול חן חתקופת החסכם
וחן בתקופת הצינון שלאחר חום ההסכם

## שונות

תקן אמריקאי האחריות לעמידה בתקן והוצאת הרישיונות כולל תוויות למוצר הינו האחריות
החברה האמרריקאית שתשא בהוצאות חברוכות מכך.

עלות התאמת מוצר יחול על שירוונית.

דיווחים ודו"חות חברה האמריקאית מתחייבת לערוך דו"חות כספיים רבעוניים מסוקרים
ולהעבירם לשירוונית לא יאוחר מתום חודש בכל סוף רבעון קלנדרי וכן דו"ח כספי שנתי מבוקר על
ידי רואה חשבון, ליום 31 בדצמבר, בתוך חודשים מתום כל שנה חקלנדרית.

## אישור זכרון הדברים וחתימת בסכם מפורט

חצדדים מתחייבים לפעול לניבוש ולקיום ההסכם שייחתם בתום לב באופן שיגשים את
הסכמתיהם שבמסמך זה.
הסכם זה כפוף לאישור דירקטוריון שירוונית ולאישורי הרשווות חמוסמכות בישראל.
ממועד אישורו של זיכרון דברים זה ועד לחתימת הסכם מפורט, יהיה זכרון דברים זה בתוקף.

## חתימות



# EXHIBIT C

## DOCUMENT

After negotiations, the parties put down in writing in the Hebrew language, their agreements for the main points and terms of a distribution agreement which includes the participation of Shirionit in the shareholder agreement between the other parties to the distribution agreement (hereinafter "the memorandum of understanding") Attached hereto.

The parties agree to sign an English translation of the memorandum of understanding which will be approved by the legal advisors of all sides within 10 days as of today.

Signed in Miami, 13 March, 1995

Ceramic Lock Intentional Inc.

Shirionit Hosen Security Manufacturing (1991) Ltd.

EXHIBIT D

# MEMORANDUM OF AGREEMENT

signed on the 13th of March, 1995

Between

## Shirionit Hosen Security Manufacturing (1991) Ltd.

and

## Crecent Locks International Inc.

Hereinbelow is a summary of the parties' agreements:

### Definitions

**The Territory:**     U.S.A., Canada and Mexico.

**The Products:**     All products presently under and subsequently developed by Shirionit, including all parts thereof and including supplementary and associated products.

**The American Company:**     Crecent Lock International Inc. and/or any other form of carrying business, directly or indirectly, by Crecent Lock International Inc. and or by the shareholders thereof at the time of its incorporation and thereafter with regard to marketing, manufacture, distribution and sale promotion of the Products.

**Shirionit:**     Shirionit Hosen Security Manufacturing (1991) Ltd. and or a company controlled by it and/or its shareholders.

## Conditions to the exclusive right of distribution

Subject to full and accurate fulfillment of the conditions specified in this Agreement and of the conditions set forth hereinbelow, Shirionit grants to the American Company the exclusive right of distribution of the Products in the Territory.

a. All products with which the American Company shall be engaged shall be under the trade mark of Shirionit, whether registered or not (hereinafter "the Trade Mark").

b. No competition: The American company and its shareholders shall refrain, directly or indirectly, by themselves or through other, from engaging in any manner whatsoever in activities of marketing, promotion, advertising or manufacturing of similar, supplementary or competing products in the Territory.

c. The American Company shall refrain from any form of involvement, directly or indirectly, in sales, marketing, promotion of sales or transfer of the Products outside the Territory.

d. Sales of the Product in the Territory shall be at a price which shall not be less than the selling price to the American Company, and if Products are not sold to the American Company, at a price which shall not fall below the international list price of Shirionit. However, if competing products shall be sold in the Territory by others and the American Company and Shirionit shall jointly decide on temporary reduction of prices and as a result thereof Products shall become available outside the Territory at lower prices than Shirionit's international sale prices, the American Company shall compensate and indemnify Shirionit against any expense incurred by it following a claim by a third party.

## Interim Period

**Term:** Two years following the earlier of the approval of this Memorandum of Agreement or the execution of a detailed agreement.

**Conditions:** Investment in promotion of the Products in an amount of not less than U.S. $ 700,00 out of which no less than U.S. $ 500,000 shall be allocated to advertising.

Purchase of 50,000 locks from Shirionit.

The American Company shall refrain from any dealing and manufacturing activity, directly or indirectly, by itself or through others.

None compliance with the conditions grant Shirionit the right to terminate this Agreement without having to pay any proceeds and in particular for developing a market in the Territory.

- 3 -

## Main Period

**Term:**                    20 years and an option for additional 20 years.

**Conditions:**              An additional investment in advertising of a minimum
                             amount of U.S. $ 1.5 million. Purchase of additional
                             50,000 locks from Shirionit during a period of 3
                             consecutive years following the Interim Period,
                             amounting to an aggregate of 200,000 locks during a
                             period of 5 years following the approval of this
                             Memorandum of Agreement.

Non compliance with the conditions grants Shirionit the right to terminate
this Agreement.

## Manufacture

A condition for commencing direct or indirect manufacturing by the American
Company and/or for purchase of locks from sub-contractors (hereinafter
"Commencement of Production"); purchase of 50,000 locks from Shirionit
during the Interim Period.

## Participation in Activity

Shirionit purchases 1/3 of the American Company in consideration as set out
below:

Shirionit investments in the American Company in the Interim Period during
which all the shareholders of the American Company shall invest therein
pursuant to their obligations, shall be made from the payments due to it for
the sales of locks to the American Company. To this end, Shirionit shall
invest one half of its income from the sale of the first 10,000 locks to the
American Company, until its aggregate investment in the American Company
shall amount to U.S. $ 250,000. The parties agree that during the Interim
Period Shirionit shall not be required to invest in the American Company
more than U.S. $ 250,000.

On termination of the Interim Period and commencement of Production,
Shirionit shall invest in the American Company resources at a value required
from the proportion of its holdings vis a vis the total investments of all the
shareholders in the paid up capital of the American Company.

The parties agree that Shirionit shall be entitled to make an investment in the
capital of the American Company by way of setting off proceeds from sales
of locks to the American Company during the Interim Period.

The agreement among the shareholders of the American Company and the statutory documents of the American Company shall be amended in a way ensuring Shirionit's equal status and rights resulting from the proportion of its holdings.

## Obligation to Market

The American Company undertakes to exert best efforts in order to promote, market and sell all of the Products, including new developments. Such efforts shall include, maintaining an adequate inventory of Products and of parts, samples, advertising in various medias, and an undertaking to establish a marketing system and a distribution center.

## Intellectual Property Rights

The American Company unreservedly recognises Shirionit's intellectual property rights of any kind, even if not yet registered, in relation to the Products.

The American Company agrees that title in and to all intellectual property rights shall remain vested in Shirionit during and after the term of the Agreement.

## Royalties

The American Company undertakes and declares as follows:

Ownership in the goodwill and intellectual property rights, remains vested in Shirionit.

In any event that Shirionit shall not hold 1/3 of the rights in the American Company there shall be paid to Shirionit royalties at the rate of U.S. $ 1 for every unit of Product, or a part thereof, sold separately in the Territory.

Royalties payable hereunder shall be paid free and clear of any deduction on account of taxes.

## Orders

The undertaking of the American Company to purchase locks from Shirionit and Shirionit's undertaking to supply locks, shall be in accordance with the following conditions:

The orders shall be more or less evenly spread throughout the period.

Each order shall consist of a minimum quantity of 1000 locks and a maximum quantity of 5000 locks, a month.

Selling price of a lock without a cylinder is U.S. $ 55. (Less U.S. $ 8 if doors shall come without lock-covers, cylinder protectors and handles).

The price is FOB Israel.

Simultaneously with the placement of the order there shall be opened an irrevocable letter of credit by a first class bank.

Delivery shall be made within 90 days from opening of a letter of credit.

Selling prices payable under this Agreement shall be clear and free of any taxes.

If safety doors shall be ordered, the above conditions shall apply with the following changes:

Maximum monthly order shall be of 1000 doors.

Selling price U.S. $ 245 for Super Lock Door 2000. Attached is Shirionit's international list price.

Advertising

The American Company undertakes that prior to commencement of advertising it shall deliver to Shirionit an advertising programme, including a projected time table and a copy of the advertising material.

Each party may use, free of charge, advertising material of the other party.

Assignment of Rights

Neither party is allowed to assign its right pursuant to this Agreement except with the written consent of the other party. The above shall not apply to an offer of shares to the public.

Liability

The parties hereby agree as follows:

Shirionit's liability is limited to the product conforming to agreed specifications. In the event of non-conformity Shirionit shall have the option to credit the American Company, to replace the Product or to repair it.

- 6 -

In any event, Shirionit's liability shall be only towards the American Company and not towards others.

To remove doubt, Shirionit does not and shall not carry a liability towards a third party or towards the American Company with regard to damages, loss of income and/or profits, directly or indirectly.

In the event that a liability shall be placed upon Shirionit by reason of any law, the American Company shall indemnify Shirionit, upon its first demand, for any amount which it shall be required to pay by reason of a judgement given against it, or an expense incurred by it in connection with the above.

The above shall survive the termination of the Agreement.

The American Company undertakes to insure itself in a product liability policy in an amount which in its opinion is sufficient, and to include Shirionit as a beneficiary thereunder.

## Consequences of Termination

Without derogating from the provisions of any law, the parties may terminate this Agreement upon occurrence of any one of the following events: bankruptcy, liquidation, appointment of receiver and like events.

In the event of termination of the Agreement following a breach by either of the parties, the breaching party undertakes, and all of its shareholders undertake, that during 3 years following the termination of the Agreement, they shall refrain, jointly and severally, directly or indirectly, from engaging in the Territory in the manufacture and/or distribution and/or sale and/or rendering services, regarding the products and/or parts thereof and/or in connection therewith and/or competing and/or similar and/or supplementary products.

If the American Company shall breach the Agreement it shall have no right to make use of the intellectual property rights, and it shall not be permitted to represent itself as having the distribution rights and or other rights connected therewith.

## Confidentiality

The parties undertake to maintain in confidence this Agreement, the agreement which shall be signed by the parties and every general information, including with regard to Shirionit's intellectual property rights, and reports exchanged between them.  The above shall apply during the life of the Agreement and during the cooling off period thereafter.

## Miscellaneous

American Standard - responsibility for compliance with the standard and for obtaining licenses, including labels to the Products shall lie with the American Company which shall bear the expenses in connection therewith.

Cost of Adaptation of Products shall be borne by Shirionit.

## Reporting and reports

The American Company undertakes to prepare quarterly unaudited financial statements and deliver same to Shirionit not later than the end of the month following the calendar quarter, and an audited financial statement by a CPA as of 31 December, within 60 days from the end of every calendar year.

## Approval of the Memorandum of Agreement and signing of a detailed agreement.

The parties undertake to act in good faith in order to ensure that the agreement subsequently signed shall reflect their agreements contained in this document.

This agreement is subject to the approval of the Board of Directors of Shirionit and of the competent authorities in Israel. As of the approval of this Memorandum of Agreement until the execution of the detailed agreement, this Memorandum shall be valid and effective.

## Signatures:

_____

יוני קורן/מכותרגום מכתב באנגלית

## DOCUMENT

After negotiations, the parties put down in writing in the Hebrew language, their agreements for the main points and terms of a distribution agreement which includes the participation of Shirionit in the shareholder agreement between the other parties to the distribution agreement (hereinafter "the memorandum of understanding").Attached hereto.

The parties agree to sign an English translation of the memorandum of understanding which will be approved by the legal advisors of all sides within 10 days as of today.

Signed in Miami, 13,March, 1995

Cercent Lock Intentional Inc.

Shirionit Hosem Security Manufacturing (1991) Ltd.